UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES of AMERICA, | * |
| | * |
| | * |
| v. | *  Criminal Action No. 10-10115-JLT |
| | * |
| JOSE SHAW, | * |
| | * |
| Defendant. | * |

MEMORANDUM

June 28, 2012

TAURO, J.

I.  Introduction

Defendant Jose Shaw was indicted on one count of being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1).[1] Currently before the court is Defendant's Motion to Suppress Evidence [#46].

II. Background

  A. Findings of Fact

In the early morning hours of December 4, 2009, Brockton Police Detectives George Almeida and Samuel Carde were on patrol.[2] The officers were dressed in plain clothes and were driving an unmarked police vehicle.[3] At approximately 2 a.m., Detective Almeida received a Nextel Direct Connect communication from off-duty Brockton Police Detective Erik Hilliard.[4]

---

[1] Indictment [#7].

[2] Hearing Tr. 9:12-16.

[3] Hearing Tr. 9:21-23.

[4] Hearing Tr. 10:7-22 (A Nextel Direct Connect communication is a telephone service similar to a "walkie-talkie." It is a one way communication, where an individual speaks and the

Detective Hilliard told Detective Almeida that, "he was receiving information from a confidential reliable informant [describing] two Cape Verdean males in the area of Crescrent Street and . . . Maple Ave. [in Brockton]."[5]

The confidential informant was known to Detective Hilliard and had provided reliable information to Detective Hilliard on three previous occasions, beginning in 2007.[6] The informant's information had, in the past, led to the seizure of two handguns, and to one arrest and prosecution.[7] In this case, the informant told Detective Hilliard that he had observed two individuals with a gun at a local bar, and the informant proceeded to give Detective Hilliard a detailed description of the two men, including their race, clothing, and location.[8] While the informant was communicating this information to Detective Hilliard on Detective Hilliard's personal cell phone, Detective Hilliard relayed the information to Detective Almeida via Nextel Direct Connect.[9]

The confidential informant told Detective Hilliard that he was following the two suspects in his car.[10] Detective Hilliard relayed to Detective Almeida the informant's description of the two

---

other listens. Once one person has finished speaking, the other may then re-connect and speak.).

[5] Hearing Tr. 10:25-11:4.

[6] Hearing Tr. 77:16-3. For convenience, the informant will be referred to as "he" although the gender and identity of the informant are not known to the court.

[7] Hearing Tr. 78:2-83:4.

[8] Hearing Tr. 63:3-64:10.

[9] Hearing Tr. 104:11-107:3; 10:12-12:24.

[10] Hearing Tr. 66:9-18.

individuals, and the fact that the informant believed one or both to be armed with a gun.[11] Detective Hilliard indicated that one suspect was wearing a red hat, red sweatshirt, and blue jeans, and that the other was wearing a black hat, black sweatshirt and black jeans.[12] Detective Hilliard received continuous updates from the informant, and was able to give Detective Almeida the precise location of the suspects. Detectives Almeida and Carde followed Detective Hilliard's directions and found the suspects on Perkins Street near Crescent Street in Brockton.[13] Detectives Almeida and Carde were followed by Officer Louis, a uniformed officer in a marked police cruiser.[14]

Upon crossing Crescent Street on to Perkins Street, Detective Almeida testified that he, "observed two Cape Verdean looking males fitting [the informant's] description, one wearing a red hat, red sweatshirt, blue jeans. The other one . . . wearing a black hat, black sweatshirt, and black jeans."[15] As he and Detective Carde approached the two men, Detective Almeida recognized the one dressed in black as Peter Teixeira, also known as "Hurt Neck."[16] Detective Almeida knew at the time that Teixeira had a criminal record and was ineligible for a license to carry a firearm because he was previously convicted of a felony.[17] Detective Almeida did not

---

[11]Hearing Tr. 11:3-8; 63:17-64:1.

[12]Hearing Tr. 11:3-8.

[13]Hearing Tr. 12:22-13:12.

[14]Hearing Tr. 21:1-19.

[15]Hearing Tr. 13:14-25.

[16]Hearing Tr. 14:6-12.

[17]Hearing Tr. 14:20-15:2.

3

recognize the other man, dressed in the red hat, red sweatshirt, and blue jeans.[18]

Detective Carde then positioned the unmarked cruiser on the east side of the street, approximately twenty feet from where the two suspects were located, and without activating the lights or drawing their weapons, the two detectives exited the vehicle.[19] Detective Louis positioned his cruiser beside, and slightly behind Detectives Carde and Almeida's vehicle.[20] Detective Almeida called out, "Yo, 'Hurt Neck,' can I holler at you for a minute," to which Teixeira responded, "Yo, Almeida, what's up."[21] At the same time, Teixeira turned to face the detectives, while his companion, now known to be Defendant Shaw, turned away from the detectives, "blading his body."[22]

Detective Almeida testified that "blading" is a defensive gesture designed to remove a weapon from a potential opponent's line of sight. The armed individual essentially turns so that the weapon is on the side of his body furthest from the opponent. Police are trained to do this, and according to Detective Almeida, most armed individuals that they encounter typically do the same.[23] At this point, after Teixeira responded to Detective Almeida's question, Detective Almeida requested that the men keep their hands where they could be seen, and Teixeira moved

---

[18]See Hearing Tr. 15:5-11.

[19]Hearing Tr. 15:17-16:5, 18:23-19:3.

[20]Hearing Tr. 42:17-43:5.

[21]Hearing Tr. 16:3-14.

[22]Hearing Tr. 16:12-15.

[23]Hearing Tr. 18:1-22.

4

his hands toward the front pocket of his sweatshirt.[24]

This gesture prompted Detective Carde to remove his service weapon and demand to see the men's hands.[25] Teixeira immediately complied with the request, but Defendant Shaw was slower to react.[26] Defendant Shaw remained with his back toward the detectives, and continued blading his body, looking over his shoulder.[27] The detectives approached Teixeira and Shaw and asked the men to face away from them.[27] At this point Officer Drane arrived in a third cruiser, which he positioned in front of the two suspects.[28] While Detective Carde kept his service weapon on the two suspects, Officer Drane stepped up to Shaw and Officer Louis stepped up to Teixeira.[29] The officers proceeded to pat-frisk the two suspects.[30]

Upon pat-frisking the right side of Defendant's waist band, Officer Drane shouted,"I got one," indicating that he had found a firearm, and both suspects were ordered to their knees.[31] At that moment, a fourth cruiser arrived driven by Officer Kalp.[32] Officer Drane removed the gun from Defendant Shaw's waistband, and the magazine fell out of the gun in the process. Officer

---

[24] Hearing Tr. 19:6-23.

[25] Hearing Tr. 19:6-20:5.

[26] Hearing Tr. 20:4-14.

[27] Hearing Tr. 20:8-14.

[27] Hearing Tr. 20:15-18.

[28] Hearing Tr. 22:9-14.

[29] Hearing Tr. 22:9-14.

[30] Hearing Tr. 22:16-18.

[31] Hearing Tr. 25:3-11.

[32] Hearing Tr. 25:15-17.

Drane immediately passed the gun and magazine to Officer Kalp, who secured them in the trunk of his cruiser.[33] Officer Drane demanded to see Defendant Shaw's license to carry the gun, and Defendant Shaw responded that he did not have one.[34] Defendant Shaw was charged with being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1), and now seeks to suppress the gun found by Officer Drane as the fruit of an illegal search.

    B.    Procedural History

On March 2, 2010, the government filed a criminal complaint against Defendant, and an arrest warrant was issued. On March 3, 2010, Defendant was arrested, and on March 4, 2010, counsel was appointed. On April 7, 2010, a grand jury indicted Defendant on one count of being a felon in possession of a firearm and ammunition. On April 13, 2010, Defendant was arraigned before Magistrate Judge Bowler. On September 6, 2011, Judge Bowler held a final status conference, and subsequently issued a Report and Order. On October 27, 2011, Defendant filed a Motion to Suppress Evidence [#46]. After a hearing held on January 12, 2012 and continued on March 15, 2012, the court took the matter under advisement.

III.    Discussion

Defendant moves to suppress the gun and ammunition seized by the Brockton Police Department on the grounds that the December 4, 2009 search was in violation of his Fourth Amendment rights.[35] Whether the search of Defendant Shaw was in violation of his Fourth Amendment rights raises two questions that must be addressed in sequence. First, whether the

---

[33]Hearing Tr. 25:13-21.

[34]Hearing Tr. 25:24-26:5.

[35]Def.'s Mot. to Supp. Ev. [#46].

6

officers had a reasonable suspicion that Defendant Shaw was engaged in criminal activity at the time he was "seized" under the Fourth Amendment, and next, whether the scope of the search was reasonable under the Fourth Amendment in light of the circumstances leading up to it.

    A.    <u>Legal Standard</u>

The Fourth Amendment proscribes unreasonable searches and seizures of individuals' persons, homes, papers, or effects.[36] While a stop and subsequent frisk of an individual falls within the ambit of the Fourth Amendment,[37] the Supreme Court held in <u>Terry v. Ohio</u>, that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest."[38] The standard of proof for a seizure under <u>Terry</u> is that, "a police officer is permitted to make a brief investigatory stop of an individual if the officer has reasonable suspicion that criminal activity may be afoot."[39] The First Circuit has elaborated by emphasizing that a "so-called <u>Terry</u> stop 'lies somewhere between a consensual encounter and a full blown arrest,'" and must be supported by an officer's reasonable suspicion, which is more than a hunch, but less than would be required to find probable cause.[40]

---

[36]U.S. Const. amend. IV.

[37]<u>United States v. McKoy</u>, 402 F. Supp. 2d 311, 313 (D. Mass. 2004), *aff'd* 428 F.3d 38 (1st Cir. 2005).

[38]<u>Terry v. Ohio</u>, 392 U.S. 1, 21 (1968), quoted in <u>United States v. Am</u>, 564 F.3d 25, 29 (1st Cir. 2009).

[39]<u>Am</u>, 564 F.3d at 29.

[40]<u>Id.</u> (quoting <u>United States v. Harris</u>, 218 Fed. Appx. 525, 527 (7th Cir. 2007)); <u>see also</u> <u>United States v. Camacho</u>, 661 F.3d 718, 726 (1st Cir. 2011) ("The reasonable suspicion standard is an intermediate, indeterminate standard that requires more than a mere hunch but less than probable cause.").

In order to effect a lawful Terry stop, an officer must have reasonable suspicion at the time that the suspect is seized for Fourth Amendment purposes. An otherwise innocuous encounter between a citizen and a police officer, "rises to the level of a seizure when the interaction is compelled by physical restraint or a nonphysical show of authority rather than by the citizen's voluntary compliance."[41] As most individuals inherently feel a degree of compulsion when questioned by law enforcement, courts apply an objective standard to determine whether the encounter was sufficiently coercive to rise to the level of a seizure under the Fourth Amendment.[42] "In the absence of evidence of coercion, 'otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.'"[43]

In determining if a seizure has occurred, "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go on about his business.'"[44] Circumstances that might transform a consensual encounter into a seizure include, "the threatening presence of several officers, the display of the officers' weapons, any physical touching of the defendant, and the use of language or tone of voice that indicates that

---

[41] United States v. Ford, 440 F. Supp. 2d 16, 19-20 (D. Mass. 2006) (Tauro, J.) (citing United States v. Smith, 423 F.3d 25, 28-29 (2005)).

[42] Ford, 440 F. Supp. 2d at 19-20.

[43] Smith 423 F.3d at 28 (citing United States v. Mendenhall, 446 U.S. 544, 555 (1980)).

[44] Florida v. Bostick, 501 U.S. 429, 437 (1991) (citing Michigan v. Chesternut, 486 U.S. 567, 569 (1988)).

compliance with the officers' request is not discretionary."[45] A seizure requires not only an assertion of authority, as described above, but also submission to that authority.[46] The law, thus, makes clear that not every encounter between a police officer and a civilian falls within the scope of the Fourth Amendment.[47]

At its inception, a seizure pursuant to a Terry stop must be supported by an officer's "reasonable suspicion supported by articulable facts that 'criminal activity may be afoot.'"[48] Although the "reasonable suspicion standard requires more than a visceral hunch about the presence of illegal activity, it requires less than probable cause."[49] The First Circuit has found that, "'suspicious circumstances reported to the police by a reliable [known] person in a nonconclusory fashion' may in certain circumstances be sufficient to warrant a Terry stop."[50] Where an officer executes a stop in reliance on a tip, the tip must be, "reliable in its assertion of illegality, not just in its tendency to identify a determinate person."[51]

A tip's reliability is enhanced when it comes from an informant who is known to police

---

[45]Ford, 440 F. Supp. 2d at 20 (citing Smith, 423 F.3d at 29).

[46]California v. Hodari D., 499 U.S. 621, 626-29 (1991); Smith, 423 F.3d at 31 (quoting United States v. Sealey, 30 F.3d 7, 9 (1st Cir. 1994)).

[47]Smith, 423 F.3d at 28 (citing Mendenhall, 446 U.S. at 555 (1980)).

[48]United States v. Dancy, 640 F.3d 455, 461 (1st Cir. 2011) (citing United States v. Ramos, 629 F.3d 60, 65 (1st Cir. 2010)).

[49]United States v. Brown, 500 F.3d 48, 54 (1st Cir. 2007).

[50]United States v. Monteiro, 447 F.3d 39, 44 (1st Cir. 2006).

[51]Florida v. J.L., 529 U.S. 266, 272 (2000) quoted by Monteiro, 447 F.3d at 47.

9

officers, and who has provided reliable information in the past.[52] In light of the totality of the circumstances, a "sufficiently specific tip from an informant of proven reliability can establish probable cause for an arrest, not merely a *Terry* stop."[53] When a tip is corroborated by other evidence, the combination lends greater support to an officer's reasonable suspicion that criminal activity is afoot.[54] An informant's credibility is also heightened when he is able to provide information that indicates first-hand knowledge of the conduct that forms the substance of the tip.[55] At base, "[w]hile the source's general credibility must be considered, all the law requires is that, when all the pertinent considerations are weighted, the information reasonably appears to be reliable."[56] In the reasonable suspicion analysis a tip, therefore, becomes one factor to be considered by an officer in light of the entirety of the situation.

A tip need not be given to the officer making the Terry stop himself in order to inform the officer's finding of reasonable suspicion. The First Circuit has emphasized that, "police may rely

---

[52] See Monteiro, 447 U.S. at 44; see also Adams v. Williams 407 U.S. 143, 144-45 (1972).

[53] United States v. Vasquez, 544 F.3d 348, 350 (1st Cir. 2008).

[54] See, e.g., Monteiro, 447, U.S. at 47 ("there may be *Terry*-stop cases in which corroboration comes in part from an individual's gang affiliation and/or recent arrests for conduct related to the activity referred to in a tip. Criminal history certainly can be considered in a reasonable suspicion analysis."); see also United States v. Bates, 750 F. Supp. 2d 342, 347 (D. Mass. 2010) ("The question is ultimately whether the police had a reasonable suspicion that criminal activity was afoot, and the touchstone of the analysis is whether 'in light of all the circumstances' the '[tip] possessed sufficient indicia of reliability .'" (quoting United States v. Ruidiaz, 529 F.3d 25, 31 (1st Cir. 2008)).

[55] Brown, 500 F.3d at 55 (citing United States v. Barnard, 299 F.3d 90, 93 (1st Cir. 2002)).

[56] Brown, 500 F.3d at 55 (citing Illinois v. Gates, 462 U.S. 213, 230 (1983)).

on information of other members of their force and respond accordingly."[57] Reasonable suspicion can be imputed to the officer executing a search under the collective or pooled knowledge principle if he "'acts in accordance with the direction of another officer who has reasonable suspicion.'"[58] Accordingly, if the officer conducting the stop relies on information provided by a fellow officer who lacks reasonable suspicion, "a stop in objective reliance upon [that information] violates the Fourth Amendment."[59]

In sum, at the time a Terry stop occurs and a suspect is seized for purposes of the Fourth Amendment, the officer conducting the stop must have a reasonable suspicion based on the totality of the circumstances, that the suspect is engaged in criminal activity. Reasonable suspicion may be based on all available information, including information received from fellow officers, the seizing officer's prior knowledge of the suspect, and the course of events leading up to the stop itself.[60]

After a lawful Terry stop, "a pat-frisk for weapons is also permissible where 'the officer is justified in believing that the person is armed and dangerous to the officer or others.'"[61] As the First Circuit recently enunciated:

> Where a police officer observes unusual conduct which leads him

---

[57] United States v. Aitoro, 446 F.3d 246, 254 (1st Cir. 2006) (citing United States v. Romain 393 F.3d 63,71 (1st Cir. 2004) ("Police officers are not limited to personal observations in conducting investigatory activities.")).

[58] Am, 564 F.3d at 31 (quoting United States v. Barnes, 506 F.3d 58, 62-63(1st Cir. 2007)).

[59] United States v. Hensley, 469 U.S. 221, 232 (1985) quoted in Am, 564 F.3d at 31.

[60] See, e.g., Am, 564 F.3d at 29-31.

[61] Aitoro, 446 F.3d at 252 (quoting Romain, 393 F.3d at 71).

11    11

>    reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him. Such a search is a reasonable search under the Fourth Amendment, and any weapons seized may properly be introduced in evidence against the person from whom they were taken.[62]

The Fourth Amendment analysis of a Terry stop and subsequent frisk, therefore, runs along a continuum with the officer and the suspect's conduct during the course of the stop being taken into account in determining the propriety and scope of a search.

   B.   Application

In the present matter, the encounter between the detectives, Teixeira and Defendant Shaw began as a consensual encounter, escalated to a seizure, and culminated with the search of Defendant that produced the gun and ammunition Defendant now seeks to suppress. In order to assess the propriety of the search that lead to the discovery of the gun and ammunition, the court must first consider when Defendant was "seized" for Fourth Amendment purposes, and whether that seizure was supported by the detectives' reasonable suspicion that Defendant was engaged in criminal activity.

The chain of events leading up to the search of Defendant Shaw began when Detective Hilliard received a tip from a confidential informant. The informant was known to Detective Hilliard and had provided reliable information on three prior occasions.[63] The tip in this case,

---

[62]Camacho, 661 F.3d at 724-25 (quoting Terry, 392 U.S. at 30-31).

[63]Hearing Tr. 77:16-83:5.

12

because it came from a known, reliable informant, is similar to the one relied upon by the police in Adams v. Williams.[64] There, the Supreme Court found that an officer had a reasonable suspicion to conduct a *Terry* stop where he received a tip from an informant who was known to him personally and had given him information in the past.[65] The fact that the tip to Detective Hilliard, while not conveyed in person, did come from a known informant is significant because it indicates that the informant could be held accountable by the police if he were to provide false information.[66]

The key factor in determining whether reasonable suspicion may be based on an informant's tip is whether, "when all the pertinent considerations are weighed, the information reasonably appears to be reliable."[67] The informant who relayed the tip to Detective Hilliard was able to provide first-hand information including a description of the suspects' race, attire, and up to date location. Each of these factors indicating first-hand knowledge enhances the informant's credibility.[68] The tipper also relayed that the two men were carrying a gun, and that he knew this because he had seen the two men with the gun. In relying on the information provided by the confidential informant, Detective Hilliard, therefore, had a reliable basis to suspect that the individuals identified by the tip were engaged in criminal activity, and was justified in contacting

---

[64]Adams, 407 U.S. at 146-47.

[65]Monteiro, 447 F.3d at 44 (quoting Adams, 407 U.S. at 144-45).

[66]United States v. Greenburg, 410 F.3d 63, 67 (1st Cir. 2005) (finding law enforcement officer's knowledge of an informant's identity bolstered the informant's credibility because the informant would be able to be held accountable if he provided false information.).

[67]Brown, 500 F.3d at 55 (citing Gates, 462 U.S. at 230).

[68]Brown, 500 F.3d at 55 (citing United States v. Barnard, 299 F.3d 90, 93 (1st Cir. 2002)).

13

the officers on duty and asking them to investigate.

Police officers conducting a terry stop are entitled to rely on information provided by their colleagues on the police force. As the Supreme Court has stated, "effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and that officers, who must often act quickly cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information."[69] Here, it was reasonable for Detectives Almeida and Carde to rely on Detective Hilliard's statements regarding the tip he received from the confidential informant, and to proceed to investigate.

When an officer relies in whole or in part on information provided by another member for the force, "[u]nder the 'collective knowledge' or 'pooled knowledge' principle, 'reasonable suspicion can be imputed to the officer conducting a search if he acts in accordance with the direction of another officer who has reasonable suspicion.'"[70] Conversely, if the information is given from one officer to another in the absence of reasonable suspicion, reliance upon it runs afoul of the Fourth Amendment.[71] Here, the tip given to Detective Hilliard had sufficient indicia of reliability, as indicated above, to allow Detectives Almeida and Carde to reasonably rely on it in proceeding to question the suspects.

Reasonable suspicion based on an initial apparently reliable tip may be enhanced if officers are able to confirm details provided by the informant upon reaching the suspects identified in the

---

[69]United States v. Hensley, 469 U.S. 221, 231 (1985) (citing United States v. Robinson, 536 F.2d 1298, 1300 (9th Cir. 1976)).

[70]Am, 564 F.3d at 31 (quoting Barnes, 506 F.3d at 62-63).

[71]Am, 564 F.3d at 31 (quoting Hensley, 469 U.S. at 232).

14

tip.[72] Here, Detectives Almeida and Carde relied on Detective Hilliard's information from the confidential informant in locating Teixeira and Defendant Shaw.[73] They observed the suspects' clothing and complexions to match those described by the confidential informant.[74] They also found the suspects in the precise location described to Detective Hilliard by the confidential informant.[75] The fact that these elements of the tip were corroborated by the detectives' observations contributed to the reasonableness of Detective Almeida and Detective Carde's reliance on Detective Hilliard's information.[76]

Once they had located the suspects described by the confidential informant, Detectives Almeida and Carde proceeded to investigate further before seizing the suspects. Detective Almeida immediately recognized one of the men identified by the tip as Peter, 'Hurt Neck,' Teixeira, whom he knew to be a felon and ineligible to carry a firearm.[77] At this point, rather than start a Terry stop, Detective Almeida opted for a "soft approach."[78] He and Detective Carde,

---

[72] United States v. Alston, 112 F.3d 32, 35 (1st Cir. 1997).

[73] Hearing Tr. 10:12-12:24.

[74] Hearing Tr. 13:14-25. Although Defendant contends that the clothing description was not accurate because Defendant's sweatshirt had prominent white stripes on it (Def.'s Mem. in Supp. [#47] at 3-4), this argument is without merit because the consideration of whether a Terry stop was valid requires an evaluation of the totality of the circumstances. In light of the numerous details that were in agreement with the informant's tip, the informant's failure to mention the stripes on Defendant's sweatshirt does not defeat a finding of probable cause.

[75] Hearing Tr. 12:22-13:12.

[76] See Brown, 500 F.3d at 55 (citing Gates, 462 U.S. at 230) ("While the source's general credibility must be considered, all that the law requires is that, when the pertinent considerations are weighed, the information reasonably appears to be reliable.")

[77] Hearing Tr. 14:10-15:2.

[78] Hearing Tr. 53:5-54:11.

who were dressed in plain clothes, pulled their unmarked cruiser up next to the suspects and, without activating the lights or sirens, exited the vehicle. As he exited the cruiser, Detective Almeida asked to talk to Teixeira, and Teixera responded affirmatively.

At this point, under the objective analysis, there was no Terry stop, and the suspects were not seized for Fourth Amendment purposes. As this court has previously held, "Law Enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen."[79] None of the traditional factors used to assess the presence of police coercion were present, and there was no objective indication that Shaw and Teixeira were not free to disregard Detective Almeida's request and leave the area.[80] Such an encounter does not trigger Fourth Amendment scrutiny until and "unless it loses its consensual nature."[81]

Events occurring after the start of the interaction between an officer and a suspect may be taken into account in determining whether the officer had a reasonable suspicion that criminal activity was afoot at the time the suspect was seized.[82] Here, once the interaction between Detective Almeida and Teixeira had begun, Teixeira moved his hands toward the pocket of his

---

[79]Ford, 440 F. Supp. 2d at 19 (quoting Smith, 423 F.3d at 28).

[80]See Ford, F. Supp. 2d at 20 ("Factors that might elevate a police encounter from a voluntary conversation to a seizure include the threatening presence of several officers, the display of the officers' weapons, any physical touching of the defendant, and the use of language or tone of voice that indicates that compliance with the officers' request is not discretionary." (citing Smith 423 F.3d at 29)).

[81]Bostick, 501 U.S. at 434 (quoting Hodari D., 499 U.S. at 628).

[82]See Bates, 750 F. Supp. 2d at 350 ("[T]he question is whether subsequent events . . . provided police with a reasonable suspicion of criminal activity that was not supported by the tip alone.") (citing United States v. Simmons, 560 F.3d 98, 106-07 (2d Cir. 2009).

16

sweatshirt, and Defendant Shaw "bladed" his body in a way that indicated to Detective Almeida that Shaw was armed.[83] As an encounter between law enforcement and a suspect progresses, "an officer's 'subsequent actions must be responsive to the emerging tableau – the circumstances originally warranting the stop, informed by what occurred, and what the officer learned as the stop progressed.'"[84]

The tip, the suspects' location, Detective Almeida's knowledge of Teixeira's ineligibility to possess a firearm, and the suspects' movements once Detective Almeida approached combined to provide a basis for Detective Almeida's reasonable suspicion that Teixeira and Shaw were engaged in criminal activity. The First Circuit has emphasized that, "even innocuous facts, which taken alone may not be 'sufficient to create reasonable suspicion [,] . . . may in combination with other innocuous facts take on added significance.'"[85] Other courts have found that furtive gestures, such as a suspect moving his hands toward his pockets when police have reason to believe he is armed, can form the basis of an officer's reasonable suspicion necessary to effect a Terry stop and subsequent pat-frisk.[86] In light of the totality of the circumstances, and the knowledge they possessed at the time, from both the tip and observations at the scene, the detectives were justified in ordering Teixeira and Shaw to show their hands, and thus executing a Terry stop by a show of authority, and the suspects' subsequent acquiescence. Once Defendant Shaw "bladed" his body and Teixeira moved his hands toward his pocket, the officers ordered

---

[83]Hearing Tr. 17:1-19:10

[84]Am, 564 F.3d at 32 (quoting United States v. Coplin, 463 F.3d 96, 100 (1st Cir. 2006)).

[85]Am, 564 F.3d at 30 (quoting Ruidaz, 529 F.3d at 30).

[86]See, e.g., United States v. Simmons, 560 F.3d 98, 109 (2d Cir. 2009).

17

both men to show their hands. More officers then arrived, and all drew their service weapons. At this point, there can be no doubt that Teixeira and Shaw were seized for the purposes of a Fourth Amendment analysis.[87]

The next question presented, therefore, is whether the pat-frisk of Defendant was appropriate after the lawful Terry stop. "'Officers are permitted to take actions to protect their own safety and the safety of others in the area,' including conducting a pat-frisk, if under all the circumstances they have 'a particularized and objective basis to suspect the individual ha[s] a weapon.'"[88] A protective pat-frisk is, therefore, permitted when, in light of the totality of the circumstances after a lawful Terry stop, an officer has a specific reason to believe that the stopped suspect is armed and dangerous.

"[I]n determining whether a pat-down search is an appropriate step following a valid *Terry* stop, the key is whether . . . 'the officer is justified in believing that the person is armed and dangerous to the officer or others.'"[89] In this case, the content of the tip to Detective Hilliard had indicated that Teixeiara and/or Shaw were armed. In their investigatory activities, "[t]he police may rely on information of other members of their force and respond accordingly."[90] At the time the stop commenced, as explained above, the officers had a reasonable suspicion to believe that

---

[87]See Carmacho, 661 F.3d at 725 ("A Fourth Amendment seizure occurs when a police officer 'has in some way restrained the liberty of a citizen' through 'physical force or show of authority.'" (quoting Terry 392 U.S. at 19 n.16)).

[88]United States v. Dancy, 640 F.3d 455, 461 (1st Cir. 2011) (citing United States v. Mohamed, 630 F.3d 1, 6 (1st Cir. 2010)).

[89]Bates, 750 F. Supp. 2d 3 at 351 (quoting Romain, 393 F.3d at 71).

[90]Aitoro, 446 F.3d at 254 (citing Romain, 393 F.3d at 71 ("[p]olice officers are not limited to personal observations in conducting investigatory activities.")).

18

Teixeira and Shaw were engaged in criminal activity. When Detective Carde ordered the men to show their hands, Shaw was slow to comply and continued to "blade" his body, a maneuver Detective Almeida recognized as characteristic of someone carrying a firearm.[91] The officers' observations on the scene served to corroborate the tip relayed by Detective Hilliard, and gave the officers a firm basis for believing that Defendant Shaw was armed and presently dangerous. The pat-frisk of Defendant Shaw, therefore, was in compliance with the requirements of the Fourth Amendment.

IV. Conclusion

Because the stop and the subsequent pat-frisk were did not violate the Fourth Amendment, there is no basis for the exclusion of the gun and ammunition that were found on Defendant Shaw. Accordingly, Defendant's Motion to Suppress Evidence [#46] is hereby DENIED.

AN ORDER HAS BEEN ISSUED.

/s/ Joseph L. Tauro

United States District Judge

---

[91] Hearing Tr. 18:1-14.